# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| DRAGAN VASIJEVIC, | Civil Action No.: |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SARASOTA MEMORIAL HEALTH CARE SYSTEM, | |
| Defendant. | |

Plaintiff Dragan Vasijevic ("Vasijevic" or "Plaintiff"), by and through his attorneys, Crabill PLLC, hereby allege as follows against Defendant Sarasota Memorial Health Care System ("SMH," the "Organization," or "Defendant"):

## PRELIMINARY STATEMENT

1. Soon after he started working at SMH, Vasiljevic was subjected to unwanted and non-consensual hugging by his supervisor Cherie Cecci ("Cecci"), SMH's Clinical Business Systems Analyst Lead.

2. Throughout Vasiljevic's employment, Cecci hugged Vasiljevic by placing both of her arms around Vasiljevic so that the front of their bodies touched completely and Cecci's breasts rubbed against Vasiljevic.

3. Cecci's intimate and non-consensual hugging of Vasiljevic made him uncomfortable, especially because he is married and a father and Cecci was his female supervisor.

4. Vasiljevic experienced anxiety, stress, and unease due to Cecci sexually harassing him and concern that her unwanted and non-consensual hugging of him could be misinterpreted by others or place him at professional risk.

5. Because Cecci was Vasiljevic's direct supervisor, Vasiljevic feared that Cecci would retaliate against him if he complained about her inappropriate and non-consensual hugging of him.

6. However, after several months of being forced to endure hugging by Cecci, Vasiljevic complained to Cecci during a meeting in her office in early December 2025 that her hugging him made him uncomfortable and asked her to stop hugging him.

7. Cecci froze and did not say anything in response to Vasiljevic's complaint.

8. Cecci also did not do anything to address Vasiljevic's complaint.

9. Instead, the next day, Cecci again hugged Vasiljevic without his consent during a holiday party for members of Cecci's team, feeding her desire to continue to hug Vasiljevic even though he complained to her that her unwanted and non-consensual hugging of him made him uncomfortable and had asked her to stop hugging him.

10. On December 10, 2025, days after Vasiljevic complained, Cecci provided Vasiljevic with a Corrective Action Form outlining unfair and false criticisms of his work performance.

11. Indeed, for over eight months, Vasiljevic had demonstrated that he was a hard worker and strong performer.

12. For example, only a few weeks before Vasiljevic complained to Cecci about her non-consensual hugging of him and at Cecci's request, Vasiljevic took over a project from another Business Analyst who was struggling with his work while continuing to work on his own assignments.

13. On December 17, 2025, Vasiljevic filed a Conflict Resolution Grievance form in which he challenged criticisms Cecci included in the December 10 Corrective Action form.

14. In the Conflict Resolution Grievance, Vasiljevic requested examples of his supposed poor performance and criteria and guidance he could use to meet Cecci's expectations.

15. That same day, Cecci and SMH fired Vasiljevic.

16. In a clear attempt to justify the unlawful firing and apparently understanding that the baseless criticisms in her December 10 Corrective Action form to Vasiljevic could not support a termination, Cecci provided Vasiljevic with

3

a second Corrective Action form during the termination meeting in which he asserted new performance critics that are also without merit.

17.     Specifically, Cecci claimed that Vasiljevic was not working full days when he worked remotely on Mondays and Fridays per his work schedule.

18.     However, Vasiljevic had worked remotely for over eight months without issue.

19.     Cecci also accused Vasiljevic of working remotely from California on November 14, 2025 without permission, which is a baseless allegation that is easily defeated.

20.     Indeed, had Cecci or anyone else at SMH conducted any legitimate investigation into the accusation before using it justify firing Vasiljevic, they would have learned that it was physically impossible for Vasiljevic to have worked remotely from California on November 14, 2025.

21.     Additionally, Cecci and SMH did not provide Vasiljevic with any opportunity to improve the supposed poor performance.

22.     Instead, Cecci and SMH quickly dismissed Vasiljevic in clear retaliation for his daring to challenge Cecci hugging him without his consent and frustrating her desire to hug him.

4

23.     The discrimination and retaliation that Defendant committed against Arnold violates, *inter alia*, Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Florida Civil Rights Act, Fla. Stat § 760.01, *et seq.* ("FRCA")

## JURISDICTION AND VENUE

24.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the ADA.

25.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State law.

26.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

27.     On March 25, 2026, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of the Title VII.

28.     Plaintiff received a Notice of Right to Sue from the EEOC on April 17, 2026.

29.     Fewer than 90 days have passed since Plaintiff received her Notice of Right to Sue.

30.   Any and all other prerequisites to the filing of this action have been met.

## PARTIES

### A.   Plaintiff Dragan Vasijevic

31.   Vasijevic is a resident of the State of Florida.

32.   Vasijevic was employed by SMH from in or around March 17, 2025 through on or around November 14, 2025.

33.   At all relevant times, Vasijevic was an "employee" of SMH within the meaning of all relevant statutes and regulations.

### B.   Defendant Sarasota Memorial Health Care System

34.   SMH is a public, nonprofit health care organization that operates hospitals, emergency rooms, outpatient facilities, and medical practices that provide a wide range of medical services and patient care throughout the Sarasota, Florida region.

35.   SMH's principal place of business is located at 1700 South Tamiami Trail, Sarasota, Florida 34249 (the "Hospital").

36.   At all relevant times, SMH controlled and directed the terms of employment and compensation of Vasijevic.

37.   At all relevant times, SMH established, implemented, disseminated, and controlled the employment policies applicable to Vasijevic, including, *inter*

*alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

38.    At all relevant times, SMH maintained and exercised authority to hire, fire, discipline, and promote Vasijevic.

39.    At all relevant times, Vasijevic was an "employee" within the meaning of all relevant statutes and regulations.

## FACTS

### A.    BACKGROUND

40.    In or around 2025, SMH began implementing a software by Epic Systems Corporation called the Electronic Health Record system ("Epic EHR") aimed at unifying its clinical, operational, and billing systems into a single integrated platform, improving care coordination, data access, and overall efficiency across the Organization.

41.    Epic EHR is a major healthcare software platform widely used by hospitals, health systems, and large medical practices in the United States and beyond.

42.    At its core, Epic EHR is a comprehensive digital system that replaces paper charts and helps clinicians collect, access, manage, and share patient health information electronically.

43.    As part of its efforts to implement Epic EHR, SMH hired Vasiljevic as a Business System Analyst II on or around March 17, 2025.

44.    In that role, Vasiljevic was tasked with designing, configuring, and implementing a system within the Epic EHR software related to real-time tracking of medical supplies, equipment, and utilization.

45.    To complete that task, Vasiljevic had to gather detailed workflow requirements from SMH's clinical staff, supply chain teams, and IT personnel to understand how medical supplies and equipment are ordered, stored, used, and documented within the Organization and Epic EHR.

46.    As he gathered the information he needed, Vasiljevic began designing and configuring an integrated tracking system that maps inventory data to Epic EHR workflows, establishes real-time data feeds, and aligns with SMH's policies on procurement, usage documentation, and reporting.

47.    Soon after starting at SMH, Vasiljevic quickly established himself as a hard worker and regularly received positive feedback related to his work.

**B.    VASILJEVIC IS SEXUALLY HARASSED BY HIS FEMALE SUPERVISOR**

48.    At SMH, Vasiljevic typically worked remotely on Mondays and Fridays and at the Hospital Tuesdays through Thursdays.

49.    Vasiljevic's direct supervisor throughout his employment was Cecci who also worked at the Hospital.

50. Several times during work meetings and lunches on days when Vasiljevic worked at the Hospital, Cecci hugged Vasiljevic without his consent.

51. Specifically, Cecci instructed Vasiljevic to hug her by giving him directions such as "Come over here and give me a hug" and "I'm a hugger. Come give me a hug."

52. When she hugged Vasiljevic, Cecci placed both of her arms around him so that the front of their bodies touched completely and Cecci's breasts rubbed against Vasiljevic.

53. Typically, Cecci hugged Vasiljevic for around four seconds before she would release her grip of him.

54. Cecci's unwanted, nonconsensual, and intimate hugging of Vasiljevic made him uncomfortable and believe that Cecci wanted to pursue him romantically or sexually.

55. Vasiljevic also experienced anxiety, stress, and unease due to Cecci's invasion of his personal space and concern that her unwanted and non-consensual hugging of him could be misinterpreted by others or place him at professional risk.

56. As Vasiljevic's supervisor, Cecci was in a position of authority over him and had control over Vasiljevic's assignments, evaluations, and continued employment.

9

57.   As a result, Vasiljevic feared that Cecci would retaliate against him if he complained about her unwanted, nonconsensual, and intimate hugging of him.

58.   As explained below, Vasiljevic's instincts were correct and Cecci moved quickly to fire Vasiljevic after he complained to her about her unwanted, nonconsensual, and intimate hugging of him.

**C.   SMH FIRES VASILJEVIC FOR ENGAGING IN PROTECTED ACTIVITIES**

59.   By December 2025, Cecci had intimately hugged Vasiljevic without his consent on several occasions.

60.   As mentioned above, Cecci's intimate and non-consensual hugs made Vasiljevic uncomfortable and caused him to experience anxiety, stress, and unease, especially because he is married and a father and Cecci was his female supervisor.

61.   One day in early December 2025, towards the end of a meeting in Cecci's office concerning a work-related matter, Vasiljevic complained to Cecci that her hugging him made him uncomfortable and asked her not to hug him anymore.

62.   In response, Cecci froze and stared at Vasiljevic without saying anything.

63.   After several seconds of silence and without a response from Cecci, Vasiljevic left Cecci's office and returned to work.

10

64. Cecci never told Vasiljevic that she would look into or address his complaint or bring his complaint to HR.

65. Instead, the next day, Cecci again hugged Vasiljevic without his consent during a holiday party for members of Cecci's team, feeding her desire to continue to hug Vasiljevic even though he complained to her that her unwanted and non-consensual hugging of him made him uncomfortable and had asked her to stop hugging him.

66. Also, almost immediately after Vasiljevic complained to her about her unwanted, forced, and intimate hugging of him, Cecci began unjustly criticizing Vasiljevic as part of an obvious attempt generate a pretextual justification for firing him.

67. Indeed, prior to Vasiljevic's complaint, Cecci regularly commended Vasiljevic for his work.

68. For example, just before Vasiljevic complained to Cecci about her intimate and non-consensual hugging of him, another Business Systems Analyst II named Alex was struggling with his work.

69. Specifically, Alex was struggling to create a program for Epic EHR that physicians could use to order medication from the Hospital's pharmacy.

70. Because Alex was struggling, Vasiljevic was a strong performer, and Vasiljevic had over 17 years of experience working with the Pyxis software Alex

was using to create the medication  ordering system, Cecci asked Vasiljevic to take over the assignment from Alex which he did while continuing to work on his own assignments.

71.     Despite his strong performance and soon after he complained to Cecci about her intimate and non-consensual hugs, Cecci began micromanaging Vasiljevic and unfairly criticizing his performance.

72.     For example, on December 2, 2025, about a week after Vasiljevic complained to Cecci about her intimate and non-consensual hugs, Cecci visited Vasiljevic's office and told Vasiljevic that he needed to "recall" an email that he sent to an email group called Epic Grand Central which included SMH employees working on the Epic EHR project.

73.     In his email, Vasiljevic followed up on a request he made for information about the names SMH has assigned to cabinets at the Hospital and the contents of each cabinet so that he could add that information into Epic EHR.

74.     Cecci claimed that Vasiljevic's email lacked certain information but did not explain what information she believed he should have included in the email.

75.     Cecci also stated that Vasiljevic should have asked employees named Trevor and Dani on his team to provide the information he requested.

12

76.     In response, Vasiljevic explained to Cecci that he had already spoken with Trevor and Dani but they were unable to provide him with the information that he needed and told him that he needed to request the information from the Epic Grand Central group.

77.     For months prior to his complaint to Cecci, Vasiljevic had requested certain information from the Epic Grand Central group in connection with his work.

78.     Cecci was aware of Vasiljevic's communications with the Epic Grand Central group because she was part of the Epic Grand Central group and received emails that were sent to the group.

79.     However, Cecci did not reprimand Vasiljevic for his communications to the Epic Grand Central group until after he complained about her unwanted, forced, and intimate hugging of him.

80.     Despite Cecci's assertion that Vasiljevic's email was somehow deficient or improper, someone from the Epic Grand Central group responded to Vasiljevic's email and provided him with the information he needed to continue his work without objection or the need for any clarification.

81.     A few days later, on December 10, 2025, Cecci provided Vasiljevic with Corrective Action Form in which Cecci alleged untrue and unfair criticisms of Vasiljevic's work performance.

82. Specifically, Cecci criticized Vasiljevic for supposedly "fail[ing] to conduct proper analysis and research in Galaxy prior to requesting assistance" and "sen[ding] Orion Tasks to other teams without including the necessary information to clarify what was needed."

83. "Galaxy" refers to Epic's official online library that contains instructions, technical guides, and best practices that hospitals use to build, configure, and maintain systems connected to Epic EHR.

84. "Orion Tasks" are organized task lists in Epic that help teams track what needs to be built and tested so the system is set up correctly and in the right sequence.

85. Soon thereafter, Vasiljevic received a calendar invite from Cecci informing him that he was required to attend a December 17, 2025 meeting with her and Robert Altiero ("Altiero"), Executive Director, Clinical Systems for SMH.

86. On December 17, 2025, in response to the Corrective Action Form, Vasiljevic submitted a Conflict Resolution Grievance form in which he stated:

> I want to reaffirm that I have consistently exercised due diligence before escalating issues and worked to provide accurate information. While this process is new and there may have been opportunities to include additional detail, these instances do not reflect a lack of effort or commitment to thorough analysis and should not warrant punitive measures.
>
> To fully align with expectations, I will:
> Continue conducting comprehensive research in Galaxy prior to escalation.

14

Apply the SBAR format to all Orion tasks and email communications for clarity and completeness.
Ensure all necessary details are included before engaging other teams (as much as understand the issues).

To support consistency and fairness across teams, I request that Leadership provide clear escalation criteria and concrete examples of what constitutes sufficient analysis and task detail, and what task did I not conduct proper analysis and research in Galaxy. Without standardized guidelines, ambiguity can lead to misalignment and inefficiencies.

I am confident that these steps, combined with clearer expectations, will strengthen collaboration and reduce delays. Please advise if there are specific resources or standards, I should reference to ensure full compliance.

87. However, neither Cecci nor anyone else at SMH did anything to address or respond to the complaints and requests in Vasiljevic's Conflict Resolution Grievance form.

88. Sometime in the afternoon on December 17, 2025, Vasiljevic met with Cecci and Altiero in Altiero's office.

89. At the beginning of the meeting, Altiero and Cerrie informed Vasiljevic that SMH was terminating his employment and presented him with another Corrective Action Form.

90. In the second Corrective Action Form, Cecci falsely accused Vasiljevic of not working full days when he worked remotely on Mondays and Fridays.

91. During his employment, Vasiljevic typically worked remotely on Mondays and Fridays from on or around 8:30 a.m. and to on or around 5:00 p.m.

which aligns with SMH's supposed requirement that he was supposed to "remain online, accessible, and actively engaged in work during standard business hours between approximately 8:30 a.m. and 5:00 p.m., unless otherwise communicated and approved by leadership."

92.    Nevertheless, SMH claimed that it audited of Vasiljevic's "remote work activity to assess whether [he was] meeting expectations while working offsite."

93.    SMH asserted that "[a]n audit of system access and computer activity revealed multiple instances in which [Vasiljevic] had minimal or no Citrix, VPN, or SharePoint activity on days [he was] scheduled to work remotely and [was] not on approved leave."

94.    Citrix is a remote access and virtualization platform that lets users securely run work applications and desktops from hospital or company servers on their own devices.

95.    A VPN or virtual private network is a secure connection that encrypts internet traffic and lets a user safely access a private network, such as a hospital or company system, from a remote location.

96.    Microsoft SharePoint is a web-based platform that organizations use to store, organize, share, and collaborate on documents and information across teams.

16

97. A lot Vasiljevic's work on the Hospital's inventory-tracking system for Epic EHR did not require him to use or access Citrix, VPN, or SharePoint.

98. Instead, Vasiljevic often had to work on spreadsheets saved directly to his work computer that would be uploaded to Epic EHR after they were completed.

99. Also in the second Corrective Action Form to Vasiljevic, Cecci accused Vasiljevic of supposedly working remotely from California on November 14, 2025 without permission.

100. However, Vasiljevic never worked remotely from California in connection with his employment at SMH.

101. Throughout his employment with the Organization, Vasiljevic worked a second job as a customer service employee for Lowe's Companies, Inc. ("Lowe's") at Lowe's location at 4012 14th Street West, Bradenton, Florida 34205 ("Lowe's Bradenton Location").

102. Vasiljevic typically worked at the Lowe's Bradenton Location on Fridays after completing his work for SMH.

103. On November 14, 2025, after completing his work for SMH, Vasiljevic worked at Lowe's Bradenton Location from around 7:00 p.m. to around 10:00 p.m.

104. As such, it was physically impossible for Vasiljevic to have worked remotely from California on November 14.

17

105. Vasiljevic first learned about the alleged issues with his performance outlined in the second Corrective Action Form for the first time during the meeting with Altiero and Cecci during the December 17, 2025 termination meeting.

106. Tellingly, SMH did not provide Vasiljevic with any opportunity to correct the supposed performance deficiencies in either of the Corrective Action Forms he was provided with following is complaint to Cecci about her unwanted, nonconsensual, and intimate hugging of him.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: DISCRIMINATION

107. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

108. During the full statutory period, Plaintiff was protected by the provisions of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

109. During the full statutory period, Defendant was subject to the provisions of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

110. As set forth above, Defendant discriminated against Plaintiff on the basis of his gender in violation of the Title VII, by, *inter alia*, subjecting him to a hostile work environment, denying him equal terms and conditions of employment because of his sex, and terminating his employment.

18

111. Defendant's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the Title VII.

112. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the Title VII, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

113. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF TITLE VII: RETALIATION**

114. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

115. During the full statutory period, Plaintiff was protected by the provisions of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

116. During the full statutory period, Defendant was subject to the provisions of the Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

117. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, complaining about sexual harassment and sex discrimination.

19

118.  Defendant retaliated against Plaintiff for his protected activities in violation of Title VII by, *inter alia*, terminating his employment.

119.  Defendant's unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII.

120.  As a direct and proximate result of the Firm's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

121.  Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE FCRA: DISCRIMINATION

122.  Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

123.  During the full statutory period, Plaintiff was protected by the provisions of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.*, and all applicable regulations thereunder.

124.  During the full statutory period, Defendant was subject to the provisions of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.*, and all applicable regulations thereunder.

20

125.    As set forth above, Defendant discriminated against Plaintiff on the basis of his gender in violation of the Title VII, by, *inter alia*, subjecting him to a hostile work environment, denying him equal terms and conditions of employment because of his sex, and terminating his employment.

126.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the FCRA.

127.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the FCRA, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

128.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE FCRA: RETALIATION

129.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

130.    During the full statutory period, Plaintiff was protected by the provisions of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.*, and all applicable regulations thereunder.

21

131. During the full statutory period, Defendant was subject to the provisions of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.*, and all applicable regulations thereunder.

132. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, complaining about sexual harassment and sex discrimination.

133. Defendant retaliated against Plaintiff for his protected activities in violation of the FCRA by, *inter alia*, terminating his employment.

134. Defendant's unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the FCRA.

135. As a direct and proximate result of the Defendant's unlawful and retaliatory conduct in violation of the FCRA, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

136. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Declare that the practices complained of herein are unlawful under applicable federal and State law;

B.      Grant an injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      Grant Plaintiff an award of damages, in an amount to be determined at trial, to compensate him for his economic damages;

D.      Grant Plaintiff an award of damages, in an amount to be determined after a trial, to compensate him for all non-monetary and/or compensatory damages he has suffered, including, *inter alia*, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.      Grant Plaintiff an award of damages, in an amount to be determined after a trial, for any and all other monetary and/or non-monetary losses he has suffered;

F.      Grant Plaintiff reinstatement;

G.      Grant Plaintiff an award of prejudgment interest on the damages he is awarded to the greatest extent permitted by law;

H.    Grant Plaintiff an award of punitive damages in an amount to be determined after a trial;

I.    Grant Plaintiff an award of costs and reasonable attorneys' fees incurred in this action to the greatest extent permitted by law;

J.    Grant Plaintiff an award of reasonable costs that he has incurred in this action, including, without limitation, expert witness fees;

K.    Grant Plaintiff all other available damages to the greatest extent permitted by law; and

L.    Grant Plaintiff such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: May 14, 2026                **CRABILL PLLC**
    Lakewood Ranch, Florida

By:  _____
        Taylor J. Crabill

71-01 Austin Street
Forest Hills, New York 11375
Tel: (727) 335-1030
tcrabill@crabilllawfirm.com

*Attorney for Plaintiff and Lead Counsel*